BRIGHT, Circuit Judge,
dissenting.
I respectfully dissent. Previously, two judges on this panel reversed the convictions in this case because the trial judge erred by rejecting the expert opinion evidence in question. United States v. Rouse, et al., 100 F.3d 560 (8th Cir.1996). The new majority now affirms the convictions on grounds that such error was harmless. I disagree. Depriving the jury of the questioned evidence critically eroded the strength of the defense and, therefore, did not constitute harmless error.[13]
I. DISCUSSION
This dissent fully incorporates the panel opinion previously reported at 100 F.3d 560. In the interests of comprehension, however, I shall reiterate some of that prior opinion.
The convictions rested upon the following evidence: the uncorroborated testimony of four of the thirteen children initially removed from their families, medical evidence describing tissue injuries in the victims’ vaginal and anal areas, and statements the alleged victims made to other adults. In my view, this evidence is suspect. For example, the “children’s evidence and testimony [in this trial] became tainted by suggestive influences to which the children were subject in the investigation and trial, which influences included taking the children (the alleged victims and nine other children) from their families and from their residences” for extended periods of time. Id. at 562. During this isolation, which lasted up to six months, social workers and investigators subjected the alleged victims to repeated and intense questioning. Despite the interrogation, nine of the children steadfastly denied any abuse.
Furthermore, the medical evidence introduced at trial was inconclusive. For example, the defense challenged the conclusions of the prosecution’s witnesses, the prosecution failed to establish the source of any injuries to the alleged victims, and the medical evidence lacked photographic documentation of the injuries. See id. at 575-76. In addition, the district court excluded important evidence of inter-child sexual activity which potentially skewed the medical findings relating to the victims’ injuries. Id. These ambiguities magnified the importance of the children’s testimony to the jury’s verdict, thereby exacerbating the harm suffered by the defense when the district court excluded the expert’s opinion. The following discussion reiterates the background for the expert’s testimony and explains why the exclusion of that testimony resulted in substantial harm.
A. BACKGROUND FOR THE, EXPERT TESTIMONY
The panel’s earlier opinion discussed the investigation by social services personnel, the FBI’s interrogations of the alleged victims and others, and the manner of eliciting the children’s testimony. See id. at 563-66. The opinion also questioned the reliability of the children’s bizarre stories. Id. at 563-66 (noting, for example, that investigators and social workers offered rewards for the children’s “truthful” testimony).
We examine the defense’s offer of proof, including background evidence provided to the court by the expert witness outside the *575 presence of the jury. We repeat from our earlier opinion:
At trial, the defense offered the testimony of Dr. Ralph Charles Underwager. Dr. Underwager is a clinical psychologist and has been practicing his profession or teaching psychology for approximately twenty years. He has conducted extensive research and writing in the area of child sex abuse and is familiar with extensive psychological research into this subject during the past ten years. His expertise has not been challenged by the prosecutor, only the substance of his testimony.
With this background, we examine Dr. Underwager’s foundation and compare that foundation and his commentary 'on suggestibility with the status as of the time of trial of psychological research and writings concerning child witnesses and their susceptibility to faulty memory. As noted above, in the defense’s offer of proof, Dr. Underwager testified outside the presence of the jury that from his review of the files, records and testimony in this matter, there had been “a practice of suggestibility employed in these techniques.” (Tr. Vol. IX at 1768.)
He further testified outside the presence of the jury that Kelson’s notes revealed she had exerted a massive influence over the children; she had a powerful prior assumption or conclusion that the children had been abused; and she engaged in highly suggestive and contaminating practices, such as the groups and questioning. Dr. Underwager testified the prosecutor asked the children only if they remembered reporting an incident to a particular individual (FBI agent, social worker, etc.), rather than whether they remembered the incident itself; the prosecutor used exclusively leading questions in the courtroom and the children’s comfort level showed they were used to this type of questioning. He testified that studies show that adults almost always rely on leading questions given the task of finding something out from a child.
Dr. Underwager found the FBI’s use of sexually explicit diagrams very suggestive and leading, and asserted the evidence does not show such diagrams accomplish anything other than to suggest to the child that the interviewer is interested in sexual behavior.
He testified that a large body of research shows that the presence at an interview of several adults — -people of relatively high status — increases the conformity and compliance with what those adults expect from a child.
Dr. Underwager testified that the documents from the case files and courtroom testimony suggested to him that powerful and potentially coercive influences had been brought to bear on the small four- and five-year-old children who were taken without notice from their mothers, families and homes, without being told the reasons and kept incommunicado in a strange place where all the people around them urged them to talk about sex abuse. (Tr. Vol. IX at pp. 1768-74.)
Id. at 566, 568-69.
The prosecution, however, objected to this offer of proof because the testimony reflected “an area “within the province of the jury and not within something that an expert should testify on.’ ” Id. at 566 (quoting Tr. Vol. IX at 1771.) The district court agreed and “rejected the offer as essentially not the subject of expert testimony and not reliable or relevant under Federal Rule of Evidence 104(a) and confusing and misleading to the jury under Federal Rule of Evidence 403.” Id. at 566-67. Furthermore, the district court “barred the expert witness from testifying on whether or not the investigative practices constituted ‘a practice of suggestibility.’” Id. at 567.
The prior panel opinion demonstrated that the proposed expert testimony passed the test for reliability under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rouse, 100 F.3d at 567-68, 572 (discussing application of Daubert analysis to “soft science”). That opinion reviewed the nature of the investigations and interrogations of the children against the commentary in a recent article presented to the district court:
*576 We have examined both the evidence and the literature presented to the district court and conclude that both support the defendants’ offer- of proof. In particular, the district court made reference to a recent article by Stephen J. Ceci and Maggie Brack, Suggestibility of Child Witnesses: A Historical Review and Synthesis, 113 Psychological Bulletin 403-439 (1993), which reviews the research and writing on the subject and supports the view that the very matters observed and testified to by Dr. Underwager can produce biased, untrue or false memories in children, and more particularly young children. Almost all the other literature presented to the court is consistent with the Ceei-Bruck article.
The Ceei-Bruck article does not state that young children should not testify but observes that many common interviewing practices can produce an altered memory. Among other things, the article documents adequate research indicating the following:
1. A subject’s, particularly a child’s, original verbal answers are better remembered than the actual events themselves, yes-no questioning leads to more error, and young children are particularly vulnerable to coaching and leading questions. Id. at 406-09.
A review of the record here reveals the children were asked entirely leading questions in court. Even though the children testified by television outside the presence of defendants, the prosecutor asked suggestive questions. Not only did the questions call only for yes or no answers, the children were asked only if they remembered reporting abuse to law enforcement officers, doctors, and their therapist, rather than whether they remembered the alleged abuse itself.
The questioning at trial represents a highly questionable aspect of testifying about an event. This is exactly what Dr. Underwager described in his offer of proof.
2. Children desire to comply or cooperate with the respected authority figure interviewer and will attempt to make answers consistent with what they see as the intent of the questioner rather than consistent with their knowledge of the event even if the question is bizarre. Id. at 418-19. Interviewer bias can skew results as a child will often attempt to reflect the interviewer’s .interpretation of events, particularly when more than one interviewer shares the same presuppositions. Id. at 422. If the interviewer’s original perception is incorrect, this can lead to high levels of inaccurate recall.
Here, these children were taken from their homes on the basis of a five-year-old’s statements, and were placed under the sole supervision and influences of Donna Jordan, Jean Brock, and Ellen Kel-son — -interviewers who had decided at the outset that all the children had been sexually abused.
The FBI agents were also strong authority figures — the kind of high status interviewers described by Dr. Underwager — with preconceived notions about the facts of this case, and they did not interview the children until after the children had been with Jordan for over a week. Agent Van Roe testified that he had explained his status as an FBI agent at the initial interview and told the children that an FBI agent was like a policeman on the reservation. Van Roe testified that Jean Brock and foster mother Donna Jordan remained in the.room while FBI agents conducted the initial interviews of the children on January 19 and 21, 1994 — over a week after the children were taken from their parents’ homes, told by Jordan and Brock that this was because their uncles had done bad things to them, and put into the care of Jordan.
At this initial interview, R.R. handed investigator Hudspeth a group of papers which reflected things she had previously told foster mother Donna. Jordan which Jordan had written down for her. Thus, agents received a frame of reference which could produce bias, even before the start of the interviews.
3.Repeated questions can produce a change of answers as the child may interpret the question as “I must not have given the correct response the first time,” and the child’s answers may well become *577 less accurate over time. Id. at 419-20. Repeated questioning of victims often results over time (or even within a single interview) in an inaccurate report.
A three-month hiatus existed from the time R.R. was taken from her home to the time of her complaints of sex abuse. These children were repeatedly questioned by Brock, Jordan, Kelson, doctors and law enforcement agents. By March 1994, the children’s accounts of the familial sexual abuse were so skewed that the district court refused to admit these interviews into evidence.
4. Younger children are more susceptible to suggestibility than older children, especially in the context of stereotyping. Id. at 407, 417. Stereotypes organize memory, sometimes distorting what is perceived by adding thematically congruent information that was not perceived, and stereotype formation interacts with suggestive questioning to a greater extent for younger rather than older children. Id. at 416-17. Studies have shown children are particularly susceptible to an interviewer’s “bad man” stereotype, and when repeatedly told the actor is a bad man, they may construct a false account of an event often embellished with perceptual details in keeping with the stereotype. Id.
Here, various persons told the children from the beginning that the defendants were “bad” and that it would not be “safe” to go home until the defendants were gone. The children remained isolated from their families and community.[13] The “bad man-uncle” theme was replayed again and again, including at trial.[14] In addition, the children testified via closed circuit television based on their “fear” of defendants. While closed circuit television, other security procedures at the courthouse, and disallowing the children to see any family members before the trial did not amount to trial error, those procedures served to reinforce the children’s “bad men” stereotype of their uncles, the defendants.
5. The use of anatomical dolls or sexually explicit materials will not necessarily provide reliable evidence as children may be encouraged to engage in sexual play with dolls, etc., even if the child has not been sexually abused, and further no normative data exists on non-abused children’s use of dolls. See id. at 423-25.
The second law enforcement (January 21) interview took place at the United States Attorney’s Office with the Assistant United States Attorney present. The children saw an anatomical drawing of a penis. Later, Kelson utilized play therapy and art media, and apparently dream journals. Dr. Underwager testified that exposing children to these materials suggests to them that the authority figure wants information about sex.
6. “[A] major conclusion is that contrary to the claims of some, children sometimes lie when the motivational structure is tilted toward lying.” Id. at 433. Patterns of bribes for disclosures, implied threats in nondisclosures, or insinuations that peers have already told investigators of suspects’ abusivé behavior are highly suggestive. Id. at 423. Children will lie for personal gain, and material and psychological rewards need not be of a large magnitude to be effective. Id.
Here, the children were promised picnics, vacations and even a chance to return home as a reward for their “truthful,” successful testimony at trial. They were told they could not go home until their uncles had been successfully removed. Experts are critical of this kind of reward as “bribing” children to “admit” abuse or give abuse-consistent answers, such as promising to end the interview, or giving them other tangible rewards. Such techniques affect the accuracy of children’s reports.
7. Dr. Underwager testified regarding the concept of “cross-germination” among the children. Children in studies and in actual cases have shown that peer pressure or interaction with other children has effects on the accuracy of their reporting: they will provide an inaccurate response when other children have “already told” in order to go along with a peer group or be part of the crowd. See id. at 423; see also Stephen J. Ceci, Jeopardy in the Courtroom: A Scientific Analysis of Children’s *578 Testimony 146-50 (American Psych. Assoc. 1st ed.1995). In several cases where convictions have been overturned, children were shown to have talked with one another about the abuse, sometimes even siblings questioned siblings to get them to “open up” or provide incriminating evidence. Id. at 150-51.
As mentioned above, Kelson reported that she talked to the group in “talk circle”; that the group seemed to have discussed an agenda among themselves each week and that T.R. was the ringleader. Testimony at trial reflects that Jordan, Kelson, and FBI agents spoke to and questioned the children in groups about the abuse.
The Ceci-Bruck article’s summary relating to interviewing of children stated:
The studies on interviewing provide evidence that suggestibility effects are influenced by the dynamics of the interview itself, the knowledge or beliefs possessed by the interviewer (especially one who is unfamiliar with the child), the emotional tone of the questioning, and the props used. Children attempt to be good conversational partners by complying with what they perceive to be the belief of then-questioner. Their perceptions, and thus their suggestibility, may be influenced by subtle aspects of the interview such as the repetition of yes-no questions, but their compliance is evidenced most fully in naturalistic interview situations in which the interviewer is allowed to question the child freely; this gives the child the evidence to make the necessary attributions about the purposes of the interview and about the intents and beliefs of the interviewer.
Observations of interactions in the legal arena highlight the fact that children who testify in court are not interviewed in sterile conditions such as those found in many of the experiments we have reviewed. They are usually questioned repeatedly within and across sessions, sometimes about an ambiguous event by a variety of interviewers, each with their own agenda and beliefs. Children are sometimes interviewed formally and informally for many months preceding an official law-enforcement interview with anatomical dolls, providing an opportunity for the child to acquire scripted and stereotypical knowledge about what might have occurred.
Id. at 425. The authors conclude with these comments:
Our review of the literature indicates that children can indeed be led to make false or inaccurate reports about very crucial, personally experienced, central events.
Therefore, it is of the utmost importance to examine the conditions prevalent at the time of a child’s original report about a criminal event in order to judge the suitability of using that child as a witness in the court. It seems particularly important to know the circumstances under which the initial report of concern was made, how many times the child was questioned, the hypotheses of the interviewers who questioned the child, the kinds of questions the child was asked, and the consistency of the child’s report over a period of time. If the child’s disclosure was made in a nonthreatening, nonsuggestible atmosphere, if the disclosure was not made after repeated interviews, if the adults who had access to the child prior to his or her testimony are not motivated to distort the child’s recollections through relentless and potent sug *579 gestions and outright coaching, and if the child’s original report remains highly consistent over a period of time, then the young child would be judged to be capable of providing much that is forensically relevant. The absence of any of these conditions would not in and of itself invalidate a child’s testimony, but it ought to raise cautions in the mind of the court.
Id. at 432-33.
Rouse, 100 F.3d at 569-72. Other references also supported the reliability of the expert’s testimony.[14]
The majority does not dispute that the district court erred by excluding the offer of proof, but affirms on the basis that excluding the testimony amounted to harmless error. The majority notes the differing views on the offer of proof set forth in the prior, vacated panel opinion at 100 F.3d at 566-74, 582-85. I now examine this harmless error contention.
B. THE ERROR WAS NOT HARMLESS
In determining whether the district court’s rejection of the offer of proof of the defendants’ expert constituted harmless error, we rely on Federal Rule of Criminal Procedure 52(a). That rule states:
(a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.
We consider, then, whether the court’s error substantially affected the defendants’ rights and whether it influenced or had more than a slight influence on the jury. See Crane v. Kentucky, 476 U.S. 683, 691, 106 S.Ct. 2142, 2147, 90 L.Ed.2d 636 (1986); United States v. DeAngelo, 13 F.3d 1228, 1233 (8th Cir.1994); United States v. Copley, 938 F.2d 107, 110 (8th Cir.1991). The crucial issue at trial in this case was whether the children testified to actual events or from implanted memory. The excluded evidence directly addressed this issue and its exclusion deprived the defendants of substantial rights.
The majority considers the evidentiary error harmless because the jury received evidence about interviewing techniques, learned of the social influences affecting the alleged victims and listened to them respond to the prosecution’s leading questions. In addition, the jury heard Dr. Underwager generally describe how adults can influence children’s memories and the impact of these influences on the alleged victims’ credibility. Further, defense counsel relied on Dr. Underwager’s testimony to argue the theory of implanted memory. Thus, the majority asserts that the jury received an “informed basis on which to make its ultimate determinations as to the victims’ credibility,” and that trial testimony accords with the children’s “free recall.” Maj. Op. at 572.
I disagree for five reasons. First, in my reading of the record, no “free recall” statements by the children exist. Instead, all early statements were subject to adult influences.
Second, the jury needed the excluded expert testimony to render a truly informed judgment about whether the children’s testimony resulted from implanted memory. According to Dr. Underwager and authoritative writings discussed above, the foster home persons, the social workers, the FBI and even the district judge used or permitted potentially coercive investigative questioning and techniques. Thus, if investigators used these techniques, even with the best of motives, they potentially induced false or faulty memories and testimony. The jury, however, would not recognize these possibly coercive influences without the assistance of the excluded expert testimony.
Third, one juror “may have believed that long delay and persistent, lengthy questioning of young children would likely produce truthful testimony.” Rouse, 100 F.3d at 572, n. 15. As our previous panel opinion conclud *580 ed, however, “the contrary has been well established,” id., and this misunderstanding exemplified “the desirability and necessity of expert opinion on the subject as offered by Dr. Underwager.” Id. The juror’s belief, based on an assumption contrary to the expert’s scientific opinion, reflected the jury’s need for assistance to understand the evidence regarding the suggestibility of children’s memory.
Fourth, the majority, even if not a ground for a new trial, acknowledges that the record contains some evidence of prejudice by one or more jurors against Native Americans. See Maj. Op. at 572-73; see also Rouse, 100 F.3d at 577-78. If even slight prejudice existed in one or more jury members, evidence challenging the credibility of the children’s testimony against the Native American defendants would be important to help overcome any juror’s prejudice.
Finally, as a result of the exclusion of the expert’s opinion, the defense counsel’s argument about implanted memories of the young witnesses represented empty words unsupported by evidence. The majority refers to argument of the defense counsel:
The questions were asked over and over and over again and, when the story came out the way the adults wanted it, then the children were rewarded____ [Wjhen [J.R.] was testifying ... did you notice [the prosecutor] ... phrased most of the questions in a manner in which she would get a positive response, a “Yes” answer---- [Dr. Underwager] talked about the influence that people have on children, when they interview kids. He talked about memory, the process of reconstruction, implantation of memory, play-therapy, worthless____ The children only felt comfortable answering ‘Tes” or “No”. They didn’t show memory of the events. The FBI Agent’s diagram that he used, the drawing of the male body with the penis drawn in, what did that tell the kids that he wanted to talk about? Everything was calculated to produce some sort of compliance with these kids____
Maj. Op. at 572. Because the district court erroneously excluded the expert’s opinion that suggestive interrogation techniques potentially tainted the children’s testimony, defense counsel’s statement reflected only arguments of counsel, not evidence. With Dr. Underwager’s testimony, however, counsel’s argument could constitute substance over rhetoric.
II. CONCLUSION
For the foregoing reasons, the evidentiary error in question was not harmless; rather, its exclusion substantially harmed the defendants. The circumstances of this case raise a close question as to the validity of the verdict and, therefore, I would grant the defendants a new trial.

. In the previous opinion, we also ruled that the trial court prejudicially erred by denying “the defendants’ motion for independent psychological examination” of the children in light of the coercive questioning and interrogation of the alleged victims. See Rouse, 100 F.3d at 562-63. I stand by this ruling. Nevertheless, this error fails to justify a new trial unless the exclusion of the expert testimony regarding coercive influences on the children constituted prejudicial error.

. Kelson testified at a hearing in May 1994 that the children felt isolated, and withdrawn and missed the nurture of their mothers and extended families; "[0]ne of the children said they felt trapped, isolated." (Trial Tr. Vol. V at 694.)

. Although the children testified that Jordan, their foster mother, told them their uncles had been doing bad things to them and talked to them of the abuse, Jordan testified she had never talked to the children about their uncles or told them that their uncles were bad or did bad things. She subsequently acknowledged she had told the children a lot of bad things had happened to them, had gotten veiy specific about what these bad things were, and had told them this was not their fault. Jordan testified she deliberately tried to avoid discussing the sex abuse with the children or influencing them, but acknowledged that it had been her experience as a foster parent that children are easily susceptible to suggestion and influence by adults.
Brock also denied ever telling the children that their uncles were bad or explaining to them why they were being taken away. The children's versions and other evidence provided ample foundation for the expert's proposed opinion.

. The majority opinion discusses the trial court's rejection of Dr. Underwager’s attempt to buttress his testimony by references to other research and writings. Maj. Op. at 571-72. The majority expresses concern that admitting "other theories and writings would result in a battle of experts that could confuse or even mislead the jury.” Id. at 572. There is no battle of experts here. Even the prosecution's expert agreed that children’s memories may be falsified. Rouse, 100 F.3d at 572.